391 A.2d 1158.

STATE *v.* THOMAS J. INNIS.

AUGUST 9, 1978.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris , JJ.

Doris, J.  The defendant, Thomas J. Innis, was tried before a justice of the Superior Court, sitting with a jury, on an indictment charging him with murder, kidnapping and robbery.[1] The jury returned verdicts of guilty on all three counts. The defendant was sentenced to life imprisonment for the murder and received concurrent sentences of 20 years for the kidnapping and 30 years for the robbery. The defendant appeals.

The case presented by the state at trial was built primarily on circumstantial evidence. The testimony revealed that defendant had been picked up by a taxi on the evening of January 12, 1975, in Providence. On January 16, 1975, the body of the cab driver was found in a shallow grave in Coventry. Death resulted from a shotgun blast to the back of the head. Witnesses testified that defendant made statements implicating himself in the crime, and the state presented evidence that defendant was seen in the possession of a sawed-off shotgun prior to the commission of the crime. A sawed-off shotgun was introduced into evidence by the state.

The defendant brings several claims of error before us on appeal. Based upon our view of this case, we need only address two of defendant's contentions.

---

[1]The indictment initially contained six counts. One count was severed and passed at the beginning of trial. The remaining two counts were merged and passed at the close of the state's case.

The initial assignment of error we address is defendant's claim that the trial justice erred in denying defendant's motion to suppress evidence obtained in violation of his fifth amendment rights.

The evidence presented by the state at the suppression hearing indicated that defendant was apprehended by Patrolman Robert M. Lovell of the Providence Police Department early on the morning of January 17, 1975. Lovell placed defendant under arrest and advised him of his constitutional rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Sergeant Francis J. Sears then arrived at the scene of the arrest, and he also gave defendant his *Miranda* warnings.

Responding to the call that defendant had been apprehended, Captain John J. Leyden arrived and again advised defendant of his rights. In response to the warnings given by Leyden, defendant stated that he wanted to see an attorney. At this point Leyden had defendant placed in a police wagon for transportation to police headquarters. Three Providence police officers, Joseph Gleckman, Walter Williams and Richard McKenna, were assigned to the station wagon. Leyden ordered the three patrolmen not to question or coerce defendant in any way.

The patrolmen placed defendant in the station wagon and began their journey to the police station.[2] Once in the wagon, Gleckman informed McKenna that there was a school for handicapped children in the area, and he expressed the fear that one of the children might find the weapon and injure himself. The defendant, who was clearly able to hear the entire conversation, asked the police to return to the scene of

---

[2]At the suppression hearing on defendant's motion to suppress the shotgun and the evidence related to its discovery, there was some discrepancy in the testimony of the three patrolmen as to their seating arrangements in the wagon. Gleckman and Williams both testified that McKenna drove the vehicle. Gleckman sat with him in the front seat, and Williams was in the rear of the vehicle with defendant. McKenna, however, testified that he was sitting in the front seat with Williams, who was driving, while Gleckman was in the back with defendant.

the arrest so that he could show them where the shotgun was hidden. It is undisputed that at no time were any questions asked of defendant before he offered to lead police to the weapon.

The police wagon, which had traveled approximately one-half to one mile from the scene of the arrest, was driven back to that area, where a search for the shotgun was in progress. Upon returning, defendant was again advised of his rights by Captain Leyden. Leyden then asked defendant if he understood his rights, whereupon defendant answered that he did, and that he wanted to show the police where the weapon was hidden. The defendant then led police to the hidden shotgun and shells, which were later introduced into evidence at trial over defendant's objection.

The defendant asserts that the introduction of the sawed-off shotgun and shells, as well as the testimony of the police officers relating to the discovery of the evidence, violated both his right against self-incrimination and his right to counsel.

We turn to defendant's fifth amendment claim. There can be no doubt that an accused possesses an absolute right to consult an attorney before being subjected to police interrogation. *Miranda* v. *Arizona, supra; State* v. *Kachanis,* 119 R.I. 439, 379 A.2d 915, 916 (1977); *State* v. *Lachapelle,* 112 R.I. 105, 111, 308 A.2d 467, 470 (1973). There is no dispute that defendant requested to see a lawyer after being initially advised of his rights by Captain Leyden; and clearly, the incriminating evidence was located by police with defendant's assistance prior to his consulting an attorney. The issues we address, therefore, are (1) whether defendant was "interrogated" within the meaning of *Miranda* prior to leading police to the shotgun, and (2) if so, whether he submitted to that interrogation voluntarily by waiving his right against self-incrimination. There is no dispute that defendant was in custody.

The guidelines set down by the United States Supreme

Court regarding police questioning are straightforward and unambiguous:

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. * * *

> "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda* v. *Arizona, supra,* at 473-75, 86 S. Ct. at 1627-28, 16 L. Ed. 2d at 723-24.

We have strictly and conscientiously applied the teachings of the *Miranda* decision. *See, e.g., State* v. *Travis,* 116 R.I. 678, 360 A.2d 548 (1976); *State* v. *Lachapelle, supra.*

Since *Miranda,* the traditional notions of both "custody" and "interrogation" have been gradually expanded to meet the changing techniques and tactics of law enforcement personnel. With respect to interrogation, we have held that, under certain circumstances, even casual conversation can be interrogation when it is initiated under false pretense for the purpose of obtaining incriminating statements. *See State* v. *Travis, supra.*

The expansion of the concept of interrogation has most recently been undertaken by the United States Supreme

Court in *Brewer* v. *Williams*, 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977).

In *Brewer*, the suspect Williams was arrested and arraigned in Davenport, Iowa, on a charge of abducting a small child, whom police were unable to locate after arresting the defendant. Williams was represented by counsel in Davenport and in Des Moines, where the offense was committed. Both lawyers advised Williams not to make any statements to the police until he had been transported to Des Moines and had consulted his attorney there. Two police officers were assigned to drive Williams from Davenport to Des Moines.

During the course of the journey, one of the police officers began directing statements toward the suspect, who was asked not to respond, on the subject of the child's need for a Christian burial. At this point Williams had been given his *Miranda* warnings three times but had expressed no willingness to discuss the case and had in fact already told police that he would talk with them after consulting his Des Moines lawyer. However, as a result of the officer's remarks, Williams made several incriminating statements and then led police to the victim's body.

Williams was convicted in state court and his conviction was affirmed by the Iowa Supreme Court. He then petitioned for a writ of habeas corpus in federal court. The District Court ruled that the evidence of the events which transpired during the automobile trip was wrongly admitted against Williams because the statements were obtained in violation of both Williams' fifth and sixth amendment rights. *Williams* v. *Brewer*, 375 F. Supp. 170 (S.D. Iowa 1974). That decision was affirmed by the Court of Appeals. *Williams* v. *Brewer*, 509 F. 2d 227 (8th Cir. 1974).

The Supreme Court decided the case strictly on sixth amendment grounds and held that Williams' right to counsel had been violated by the so-called "Christian burial speech,"

given to him by the police officer. The Court, however, specifically upheld the lower court ruling that the speech was, in effect, a form of interrogation. *Brewer* v. *Williams, supra* at 400, 97 S. Ct. at 1240, 51 L. Ed. 2d at 437. The Supreme Court decision noted that Williams' constitutional claim to counsel would not "have come into play if there had been no interrogation." *Id.*

While there are several factors relating to the *Brewer* remarks which distinguish that case from the one before us, we find the differences to be constitutionally insignificant. To do otherwise would be "to play games with an individual's constitutional guarantees." *State* v. *Travis, supra* at 682-83, 360 A.2d at 551.

As the Supreme Court has noted, absent a valid waiver, any statement taken after a suspect invokes his fifth amendment rights "cannot be other than the product of compulsion subtle or otherwise." *Miranda* v. *Arizona, supra* at 474, 86 S. Ct. at 1628, 16 L. Ed. 2d at 723. We do not accept the argument that Officer Gleckman's remarks do not constitute interrogation because he was expressing only a concern for public safety and not intentionally attempting to solicit evidence of an incriminating nature. We have already held that evidence obtained by a police officer from a suspect for the purposes of self-protection of the officer in the absence of legal counsel or of a valid waiver may not be used against the suspect at trial. *State* v. *Vargus,* 118 R.I. 113, 373 A.2d 150 (1977). Public safety, like self-defense certainly a subject foremost in the mind of a police officer, nevertheless must not be permitted to become a vehicle for violating a suspect's constitutional rights.

We also reject the contention that no interrogation occurred because defendant was not addressed personally. The police officers in the wagon chose not to discuss sports or the weather but the crime for which defendant was arrested. The defendant, alone in a police wagon with three officers at 4 a.m., underwent the same psychological pressures which

moved Williams to lead police to the body of his victim. Police officers in such a situation must not be permitted to achieve indirectly, by talking with one another, a result which the Supreme Court has said they may not achieve directly by talking to a suspect who has been ordered not to respond. The same "subtle compulsion" exists.

On the facts before us, we believe that defendant was interrogated within the meaning of *Miranda* in the absence of counsel after requesting to see an attorney. Unless a valid waiver occurred, the statements of Officer Gleckman constituted an infringement of defendant's right against self-incrimination. We therefore turn to a discussion of waiver.

It is well settled that whenever a defendant decides to forego a right guaranteed by the fifth amendment, the alleged waiver must meet the strict standard of an intentional relinquishment or abandonment of a known right. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461, 1466 (1938); *State v. Vargus, supra* at 122, 373 A.2d at 154. A waiver of defendant's right to remain silent must be made voluntarily, knowlingly and intelligently. *Miranda v. Arizona, supra* at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 707. Courts will entertain every reasonable presumption against the waiver of a fundamental constitutional right, *Johnson v. Zerbst, supra,* by placing a "heavy burden" on the state to establish that such a waiver occurred. *Miranda v. Arizona, supra,* at 475, 86 S. Ct. at 1628, 16 L. Ed. 2d at 724; *State v. Vargus, supra* at 122, 373 A.2d at 154.

The evidence presented at the suppression hearing makes it apparent that defendant received his *Miranda* warnings on three occasions prior to being subjected to Officer Gleckman's remarks and that he received his warnings once more before leading police to the shotgun. No one denies that defendant, upon receiving his warnings for the third time, requested to see a lawyer.

The trial justice concluded that the statements made by defendant, and his willingness to assist police in locating the

weapon, were not the products of coercion or threats but were made voluntarily and therefore constituted a waiver of defendant's constitutional rights. The trial justice stated:

> "In the automobile, driving along Chalkstone Avenue, we have three officers who are out at four in the morning, or later, and have been prowling around searching for a weapon which they had reason to believe was there. The weapon was either loaded or with shells. It is in the area of a school where when daylight arrives handicapped and retarded children will be coming to the area. I think it is entirely understandable that they would voice their concern to each other. And I have to say that I commend the defendant for responding to the danger which, more than likely, he did not know of up until that time. There is no reason for me to believe, and no evidence on which I should conclude, that he was familiar with the area and the type of facilities that were there. So the defendant responded out of a very commendable concern to a situation that he became acquainted with. I commend him for it. He responded and then said: 'Turn around, take me back and I will show you where the weapon is.'
>
> "It was a waiver, clearly, and on the basis of the evidence that I have heard, an intelligent waiver, of his right to remain silent. And for whatever reason, whatever motivates people, as long as it is not the result of threat or coercion, it is a waiver for all purposes, and the weapon was found."

This is not a case where a defendant voluntarily confesses to a crime or admits to incriminating evidence on his own. The defendant's statement to the police admittedly occurred only after his being subjected to Officer Gleckman's remarks, remarks which were highly improper in light of the fact that defendant had not been given an opportunity to consult with his attorney.

The finding of a waiver in this situation would be highly inconsistent with the conduct of defendant, who just minutes before had chosen to exercise his right to counsel before being subjected to questioning. *See State* v. *Lachapelle, supra* at 111, 308 A.2d at 470. The record before us lacks any evidence that defendant ever disavowed his request to speak to an attorney or specifically waived any of his *Miranda* rights while in the police wagon; nor did he request an opportunity to discuss the case with one of the officers before Officer Gleckman's remarks. There is *no* evidence in the record before us indicating that defendant *affirmately* waived his fifth amendment rights at this time other than the fact that he ultimately agreed to assist the police in locating the incriminating evidence. *Id.* at 111-12, 308 A.2d at 470-71. As the Supreme Court has stated:

> "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda* v. *Arizona, supra* at 475, 86 S. Ct. at 1628, 16 L. Ed. 2d at 724.

The facts of the case at bar relating to the waiver issue dovetail the *Brewer* case with minor exceptions up to the point at which defendant received the second warning from Captain Leyden, a warning Williams never received. Because of the lack of any affirmative evidence other than the ultimate incriminating statement, all three federal courts found Williams had not waived his constitutional rights. It is true that Williams was known to police as a former mental patient and a deeply religious individual; we find no such evidence regarding defendant. However, this distinction would be relevant only if the federal courts at some stage of the proceedings had found Williams to be mentally incompetent to make such a waiver. No such finding was made.

The fourth warning received by defendant presents us with an issue not addressed in *Brewer,* however. In response to the warning given by Captain Leyden subsequent to the incriminating statement but prior to the discovery of the weapon, defendant stated that he understood his rights but wished to show police where the shotgun was hidden so that no child in the area would find it and injure himself. At this point, defendant led the police to the sawed-off shotgun that was subsequently introduced into evidence at trial over his objection.

We find no merit in the argument that, while defendant's statement in the police wagon must be suppressed, the shotgun itself is admissible evidence on the grounds that defendant waived his *Miranda* rights in response to Captain Leyden's warnings before he led police to the weapon.

In our view, to allow the shotgun to be admitted into evidence would be to allow the state to benefit from the illegal actions which occurred in the police wagon. The seizure of the weapon was the product of the improper remarks of Officer Gleckman. Because of this inescapable fact, the weapon and any evidence leading to its discovery must be suppressed as "fruit of the poisonous tree." We have no doubt that the discovery of the shotgun occurred as a result of an "exploitation" of the original illegality. *Wong Sun* v. *United States,* 371 U.S. 471, 487-88, 83 S. Ct. 407, 417. 9 L. Ed. 2d 441, 455 (1963).

Having reached the conclusion that both the shotgun and defendant's statements were obtained in violation of defendant's fifth amendment rights, we must set aside the conviction and order a new trial unless we are convinced that the error was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *State* v. *Lachapelle, supra.*

A review of the trial transcript, however, convinces us that the tainted evidence was certainly a contributing factor in the conviction of defendant, particularly in light of the fact

that most of the other evidence against defendant was circumstantial in nature. The state has not met its burden of proving harmlessness beyond a reasonable doubt. Therefore, the conviction cannot be allowed to stand.

There is one other issue raised by defendant which we feel compelled to address before this case is retried. The defendant asserts that he cannot be tried and convicted for both felony murder and the underlying felony, in this case, robbery. To do so, defendant contends, is a violation of the double jeopardy clause of the fifth amendment.

There can be no doubt that the murder conviction obtained against defendant was based solely upon the theory of felony murder. This is clear from both the evidence presented and the trial justice's instructions to the jury.[3]

The defendant contends that his double jeopardy argument ought to be upheld in light of the United States Supreme Court decision of *Harris* v. *Oklahoma,* 433 U.S. 682, 97 S. Ct. 2912, 53 L. Ed. 2d 1054 (1977).

The *Harris* decision involved a defendant who was first tried and convicted for felony murder, and then tried and convicted for committing the underlying felony, robbery with firearms. The Court, in a very brief decision, held:

> "When, as here, conviction of agreater crime, murder, cannot be had without conviction of the lesser crime, robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime after conviction of the

---

[3]The relevant portion of the trial justice's instruction on murder was presented as follows:

> "Finally, the charge of murder. Murder is: One, an unlawful killing; Two, of a human being; Three, with malice aforethought, but our law provides an alternative to that third one in this situation. Our law provides that any murder committed during the commission of certain crimes — one of them being a robbery — is murder in the first degree. We refer to that sometimes as felony murder. The elements then in this case would be the unlawful killing of a human being while in the commission of a felony, one of the listed felonies, which is robbery."

greater one. (citations omitted) '... [A] person [who] has been tried and convicted for a crime which has various incidents included in it, ... cannot be a second time tried for one of those incidents without being twice put in jeopardy for the same offence.' " *Id.* at 682-83, 97 S. Ct. at 2912-13, 53 L. Ed. 2d at 1056.

The state argues that the holding of *Harris* is restricted to instances in which a defendant is subjected to successive prosecutions, not to cases such as the one at bar in which a defendant is convicted of both crimes at the same trial. We cannot agree with the state's argument.

It is our opinion that the question of double jeopardy cannot depend solely on whether a defendant is tried once or twice for two crimes which arguably constitute the same offense. "The Fifth Amendment guarantee against double jeopardy prohibits both successive prosecution for the same offense as well as multiple punishment for the same offense." *Newton* v. *State,* 280 Md. 260, 373 A.2d 262, 264 (1977). The record makes clear that defendant was punished for both the murder and the underlying felony. Although he received concurrent sentences for the two offenses, he has been punished twice. *Id.* at 265, 373 A.2d at 265; *People* v. *Martin,* 398 Mich. 303, 310, 247 N.W.2d 303, 306 (1976). Therefore, if these crimes constitute the same offense, defendant has been placed in jeopardy twice for one illegal act, despite the fact that he had but one trial. *State* v. *Boudreau,* 113 R.I. 497, 322 A.2d 626 (1974).[4] *See also People* v. *Anderson,* 62 Mich. App. 475, 233 N.W.2d 620 (1975).

The rule followed in this state is the required evidence test adopted by the United States Supreme Court and stated in

---

[4]In *State* v. *Boudreau,* 113 R.I. 497, 322 A.2d 626 (1974), we found a violation of the double jeopardy clause when a defendant was convicted of both assault with a dangerous weapon and the commission of a crime of violence while armed with a pistol. Both convictions occurred at one criminal proceeding.

*Blockburger* v. *United States,* 284 U.S. 299, 304, 52 S. Ct. 180, 182, 76 L. Ed. 306, 309 (1932):

> "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

We have consistently followed this rule. *State* v. *Grullon,* 117 R.I. 682, 685-688, 371 A.2d 265, 267-68 (1977); *State* v. *Boudreau, supra,* at 503, 322 A.2d at 629; *State ex rel. Scott* v. *Berberian,* 109 R.I. 309, 316, 284 A.2d 590, 594 (1971).

The two offenses for which defendant was convicted were robbery, in violation of G.L. 1956 (1969 Reenactment) §11-39-1 and murder, in violation of G.L. 1956 (1969 Reenactment) §11-23-1.

The statutory crime of robbery incorporates all of the elements of the crime of robbery as it existed at common law. These elements are the felonious taking of money or other property of any value from the person of another, or in his presence, against his will, by force or fear of force. *State* v. *Domanski,* 57 R.I. 500, 190 A. 854 (1937).

Murder is statutorily defined in §11-23-1 as "[t]he unlawful killing of a human being with malice aforethought." Murder in the first degree is:

> "[M]urder perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious and premediated killing, or committed in the perpetration of, or attempt to perpetrate any arson, rape, burglary or robbery, or while resisting arrest by, or under arrest of, any state trooper or policeman in the performance of his duty; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed * * *."

As the trial justice charged, the elements of the murder conviction obtained against defendant were the unlawful killing of a human being while in the commission of the felony of robbery.[5]

The law is clear in cases of felony murder. In order to obtain a conviction, the state must prove all of the elements of the underlying felony, in addition to the other elements of murder, beyond a reasonable doubt. *Newton* v. *State, supra* at 268-69, 373 A.2d at 266-67. The only element which distinguishes these two offenses is the proof of the victim's death.

> "The evidence required to secure a first degree murder conviction is, absent the proof of death, the same evidence required to establish the underlying felony. Therefore, as only one offense requires proof of a fact which the other does not, under the required evidence test the underlying felony and the murder merge." *Id.* at 269, 373 A.2d at 267.

The *Newton* decision is quite similar to the case at bar and provides a most insightful discussion on the issue of double jeopardy. The defendant Newton was convicted of felony murder and attempted robbery, which provided the underlying felony for the murder conviction. Newton was found guilty of both charges at one trial and was given concurrent sentences of life imprisonment on the murder conviction and 20 years for attempted robbery. Newton appealed, and the Maryland Court of Appeals held that the separate convictions and sentences for the two offenses constituted double punishment for the same offense in violation of the double jeopardy clause of the fifth amendment.

The one factor which distinguishes *Newton* from the case

---

[5]See note 3, *supra*. Although we have no doubt that defendant was convicted of murder under a felony murder theory, we need only be unable to say with certainty that the jury did not find defendant guilty of murder under that theory to reach the result we do today. *See People* v. *Anderson,* 62 Mich. App. 475, 482, 233 N.W.2d 620, 623-24 (1975).

at bar is the Maryland Criminal Code, which separates the various methods by which a first-degree murder conviction can be obtained into different statutory sections. Md. Ann. Code, art. 27, §§407-410. In this state, murder in the first degree is embodied *in toto* in §11-23-1.

The difference gives rise to the state's contention that the present case does not fall within the parameters of the required evidence test as outlined by this court. The state argues that it need not prove the elements of a felony under §11-23-1 but may show, *inter alia*, the more common element of premeditated deliberation. Therefore, it argues, there are separate elements in the crimes of robbery and first-degree murder which are not included in the other offense.

We cannot accept the proposition that an individual's double jeopardy protection hinges on a legislative decision to codify the crime of first-degree murder either into one or several statutory sections. To do so would be, in effect, to allow a crucial constitutional protection to rest on legislative whim.

We note that the Supreme Court decision in *Harris* v. *Oklahoma, supra,* upon which defendant primarily rests his argument, was predicated on a statutory scheme such as our own, wherein the several acts which constitute murder in the first degree were embodied in one statute. *See* Okla. Stat. Ann., tit. 21, §701 (West).[6]

The case of *People* v. *Anderson, supra,* is also on point. In *Anderson,* the defendant was found guilty of both first-degree murder and armed robbery. The murder occurred in the course of the robbery, but whether the jury reached its verdict on a felony murder theory or found premeditated deliberation was unclear. Because of the inability to say that the verdict was not reached on a felony murder theory, the court held that the double jeopardy clause had been violated

---

[6]This statute has since been repealed and replaced by Okla. Stat. Ann., tit. 21, §701.7 (West), which still retains both forms of murder in the first degree.

and ordered the armed robbery conviction dismissed. In construing the Michigan first-degree murder statute, Mich Stat. Ann. §28.548, which is similar to our own, the court stated:

> "[I]f the jury's first-degree murder conviction was based on a finding that the killing took place during the perpetration of the armed robbery, then the armed robbery constitutes a necessary element of first-degree (felony) murder. As a necessary element of first-degree murder, armed robbery would then become an included offense in the greater charge." 62 Mich. App. at 482, 233 N.W.2d at 623-24.

We therefore hold that defendant may not be convicted of both murder in the first degree under a felony murder theory and the underlying felony of robbery. Upon retrial, if defendant is convicted on the murder count under a felony murder theory, he may not be separately convicted and punished for the underlying robbery.[7] If, however, he is convicted of murder under another theory provided in §11-23-1, or is acquitted of first-degree murder, he may be convicted of the robbery if the evidence presented so warrants.

Because of the decision we reach on the issues discussed, we do not reach the other assignments of error brought by defendant.

---

[7]It is incumbent upon a trial justice to determine the basis for a jury's verdict of guilty on a murder count when a felony murder theory has been advanced at trial. The trial justice should instruct the jury that it must indicate by its verdict whether it has found the defendant guilty under the felony murder theory or whether it has found that the murder was committed "by poison, lying in wait, or any other kind of wilful, deliberate, malicious and premeditated killing" as provided in §11-23-1. The trial justice must also instruct the jury that, regardless of its basis for finding the defendant guilty of murder in the first degree, it must also render a verdict on each of the other counts contained in the indictment. When the murder conviction is based upon a felony murder theory, the underlying felony must be merged into the murder. No conviction for the underlying felony may appear on the record, and no punishment may be imposed. See Frye v. State, 37 Md. App. 476, 378 A.2d 155, 157 (1977).

The defendant's appeal is sustained, the judgments of conviction are vacated, and the case is remanded to the Superior Court for a new trial.

Mr. Justice Paolino participated in the decision but retired prior to its announcement.

Mr. Justice Kelleher, with whom Mr. Justice Joslin joins, dissenting. The majority's opinion grafts a unique and heretofore judicially unrecognized addition to the four warnings required by *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); the fifth warning would read that the police, while in the company of a suspect who has been given his *Miranda* rights, shall remain silent at all times even among themselves; otherwise what they say to each other may be used to reverse a criminal conviction. I cannot subscribe to the view that the Federal Constitution now requires the police, upon arresting a suspect, to assume the role of contemplative monks at all times while they are in the suspect's company.

Before considering the constitutional issues, I would briefly detail the events that preceded the defendant's arrest. Shortly after the beginning of 1975, defendant, in the presence of his former girl friend, sawed off the ends of a shotgun. On the evening of January 12, 1975, he wrapped the shotgun in a blue and white blanket, went to the adjoining apartment, and asked the owner of the building to call a cab for him. When the first cab never arrived, a second was called. The dispatcher of the Silver Top Cab Company sent cab 21, with John Mulvaney driving, to pick up defendant. The owner of the apartment building watched as defendant entered the cab while carrying the blue and white blanket. Mr. Mulvaney radioed the dispatcher that he was going to East Greenwich with his fare and was never heard from again.

Cab 21 was discovered in a wooded area of Coventry a few

days later. A blue and white blanket was found 200 yards from the cab. Approximately 800 yards from the cab the nude body of John Mulvaney was discovered in a shallow grave. The cause of death was a shotgun blast to the head fired at close range.

A few hours after his cab ride, defendant knocked on the door of a Coventry resident and asked for directions to Weaver Hill Road. The defendant also asked that a cab be called for him. The resident explained that no cabs would be running at that late hour. He noticed that defendant was traveling on foot and was carrying a red flashlight similar to one owned by the deceased.

At about 4 a.m. January 13, 1975, defendant arrived at the home of a friend on Weaver Hill Road, Coventry. The defendant said his car had broken down on Route 95 and asked to spend the rest of the night there. In the morning defendant showed his friend the sawed-off shotgun. He also asked his friend to destroy the red flashlight. After a futile search for defendant's car which supposedly had broken down somewhere on Route 95, the friend gave defendant a ride to Providence.

After the friend had identified State's Exhibit 41 as the shotgun defendant had with him in the early morning of January 13, defense counsel then requested a voir dire "to determine whether or not this shotgun should be suppressed because of the fact that it was an illegal search, or a search without the consent of Mr. Innis, or even the possibility of an illegal arrest." Accordingly, the jury was excused, and an extensive voir dire was commenced regarding the circumstances under which the shotgun was discovered or seized.

The first witness called was Providence Patrolman Robert M. Lovell, who testified that in the early morning hours of January 17, 1975, he was searching the Mt. Pleasant area of Providence for the robber of a cab driver. At this point it should be noted why the Providence police were searching for defendant in the Smith Hill-Mt. Pleasant area. Shortly

before midnight on January 16 the Providence police had been notified by a cab driver that he had just been robbed by a man wielding a sawed-off shotgun.[1] The cab driver had told the police that he originally picked up his gun-toting fare, later identified as defendant, in the city of Woonsocket and dropped him off in Providence, somewhere in the area of Rhode Island College. The police immediately began searching the general area for defendant. At approximately 4:30 a.m. Patrolman Lovell spotted defendant on Chalkstone Avenue and placed him under arrest.

In accordance with *Miranda* v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), Patrolman Lovell immediately informed defendant of his constitutional rights. Within minutes other officers involved in the search for defendant arrived at the scene of the arrest. Sergeant Francis J. Sears was the first to arrive. He also informed defendant of his constitutional rights. Captain John Leyden next arrived, and he also advised defendant of his rights. More specifically, he notified defendant that he had the right to remain silent, that anything he said could be used against him in a court of law, that he had the right to an attorney, and finally that if he could not afford a lawyer, one would be appointed for him by the State of Rhode Island. He asked defendant if he understood the rights, and defendant responded in the affirmative. The defendant then said he wanted to see an attorney. In full compliance with the dictates of *Miranda*, Captain Leyden then ceased all interrogation and ordered three subordinantes to place defendant in a police car and transport him to police headquarters. Captain Leyden told the three officers that they were not to question defendant in any way.

Although there is some dispute about the seating arrangement, it would appear that Patrolmen Richard McKenna and Joseph Gleckman occupied the car's front seat, while

---

[1]The cab driver's testimony was excluded from the jury as prejudicial "other crimes" evidence.

Patrolman Walter Williams and defendant were back-seat passengers. A wire screen which ran from the top of the back cushion of the front seat to the car's roof separated the front and back portions of the car. As the police car proceeded along Chalkstone Avenue toward Manton Avenue, Officer Gleckman began talking to Officer McKenna. The back-seat passengers could hear their conversation. Officer Gleckman described the conversation as follows:

> "At this point, I was talking back and forth with Patrolman KcKenna stating that I frequent this area while on patrol and there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves.
> "Q. Who were you talking to?
> "A. Patrolman McKenna.
> "Q. Did you say anthing to the suspect Innis?
> "A. No, I didn't."

At this point defendant spoke up from the back seat and said: "Turn around, I'll show you where the weapon is." Patrolman McMenna then radioed Captain Leyden and informed him they were returning to the scene of the arrest to locate the weapon. Having traveled less than a mile, they returned to the arrest scene in a matter of minutes.

When defendant alighted from the police car, Captain Leyden once again advised defendant of his rights. He asked defendant if he understood these rights, and defendant said he did, but he wanted to get the gun out of the way because of the "kids in the area" of the school. The police moved from Chalkstone Avenue to the Pleasant View School. There, with the aid of the headlights of various police vehicles, defendant went out into a nearby field and located the shotgun and some shells under a pile of rocks.

Today a majority of this court has seen fit to vacate the conviction under review on the ground that the admission of

the shotgun violated defendant's constitutional right against self-incrimination. I cannot agree.

The majority rests its conclusion on the recent Supreme Court decision in *Brewer* v. *Williams,* 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977).[2] *Brewer* consists of a majority opinion and three concurring opinions, all of which are carefully worded and narrowly drawn. I believe that if the Supreme Court had before it the facts that were elicited at the trial in the Superior Court, *Brewer* would be considered inapposite.

In *Brewer* the accused, Williams, surrendered to the police in Davenport, Iowa, upon the advice of a Des Moines attorney. A warrant had been issued for Williams' arrest in connection with the Des Moines abduction of a 10-year-old girl. Williams' attorney was present at the Des Moines police station when the Davenport police called with the information that Williams had surrendered. In the presence of certain Des Moines police, the attorney talked to Williams on the phone and informed him that Des Moines police would be driving to Davenport to pick him up, that they would not interrogate him, and that Williams should not talk to the police regarding the abduction.

Williams was arraigned in Davenport on the Des Moines warrant and advised of his *Miranda* rights. He was represented then by a second attorney, who advised him not to make any statements to the police until he consulted with his Des Moines counsel. When the Des Moines police contingent arrived in Davenport to transport Williams, they refused to allow the Davenport attorney to accompany his client on the return trip. One of the police contingent was a detective who

---

[2]*Brewer* was decided on sixth amendment grounds (right to counsel). The majority has chosen to rely upon the fifth amendment in reaching today's result, despite the explicit refusal by the Supreme Court to decide *Brewer* under the fifth amendment. *Brewer* v. *Williams,* 430 U.S. 387, 397, 97 S. Ct. 1232, 1239, 51 L. Ed. 2d 424, 435-36 (1977).

held the rank of captain. He was present when the Des Moines attorney had advised Williams to remain silent and assured his client that he would not be interrogated on the trip to Des Moines. When the detective expressed some reservations about the no-interrogation arrangements, Williams' Davenport attorney made it clear to the detective that Williams was not to be questioned on the way back to Des Moines.

Soon after the Des Moines police set out on the 160-mile return trip to headquarters, the detective engaged his prisoner in a "wide ranging conversation." 430 U.S. at 392, 97 S. Ct. at 1236, 51 L. Ed. 2d at 432. Unlike the situation in the case presented to us, the detective specifically addressed remarks to the prisoner. Knowing that the prisoner was a former mental patient and a man of strong religious conviction, the detective delivered what is generally referred to as the "Christian burial speech." *Id.* Addressing the prisoner as "Reverend," the detective said:

> " 'I want to give you something to think about while we're traveling down the road. ... Number one, I want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visibility is poor, it's going to be dark early this evening. They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you yourself may be unable to find it. And, since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able

> to find it at all.' " 430 U.S. at 392-93, 97 S. Ct. at 1236, 51 L. Ed. 2d at 432-33.

Not far from Des Moines the prisoner directed the police to the body of the young girl.

The evidence in question was admitted at Williams' subsequent murder trial, and the jury returned a verdict of guilty. Mr. Justice Stewart, in speaking for the majority, relied heavily on *Massiah* v. *United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), and ruled that Williams had been denied the right to the assistance of counsel. A careful reading of the majority opinion reveals that the key factor underlying this conclusion was the detective's admission that his "Christian burial speech" was made "with the specific intent to elicit incriminating statements." 430 U.S. at 403, 97 S. Ct. at 1241, 51 L. Ed. 2d at 439. Justice Stewart continually stressed that the detective deliberately and designedly set out to elicit information from the prisoner. 430 U.S. at 399, 403, 405, 97 S. Ct. at 1239, 1240, 1241, 1243, 51 L. Ed. 2d at 436, 437, 439, 440. Justices Powell and Marshall, in separate concurring opinions, also stressed the intentional nature of the police conduct. 430 U.S. at 408, 412, 97 S. Ct. at 1244, 1246, 51 L. Ed. 2d at 442, 445.

In contrast, there is nothing in the record before us which suggests in any way that Patrolman Gleckman deliberately set out to elicit incriminating statements from defendant. All the evidence in the record is directly to the contrary.[3] All of the officers testified that Captain Leyden had specifically ordered them not to question defendant. All agree that after defendant requested an attorney, no one spoke to him, questioned him, or directed their remarks to him in any way. Statements volunteered by a suspect have never been thought

---

[3]The defendant did not testify or introduce any evidence during the voir dire regarding the shotgun. Therefore, the only evidence in the record is the uncontradicted testimony of all the police officers who were present when the defendant was arrested and transported to the police station.

to create constitutional problems. *Miranda* v. *Arizona,* 384 U.S. at 478, 86 S. Ct. at 1630, 16 L. Ed. 2d at 726; *State* v. *Travis,* 116 R.I. 678, 360 A.2d 548 (1976). Only the "interrogation" of a suspect after he has asserted his rights or requested an attorney is constitutionally impermissible. *Id.* While the dividing line between the two may not always be clear, when the record adduced in the Superior Court is measured against the criterion set forth in *Brewer* concerning whether the police have deliberately and designedly set out to elicit information from the suspect, it is clear that defendant was not being interrogated when he overheard Gleckman's conversation.

At the time of defendant's arrest in January 1975, Patrolman Gleckman had been a member of the Providence Police Department for just over a year. He could not have heard about the Iowa captain's impassioned exhortation because *Brewer* was not published until some 2 years later, in March 1977. Once defendant expressed his choice of consulting with an attorney, Officer Gleckman's sole duty was to assist in the transportation of the prisoner from Mt. Pleasant's Chalkstone Avenue to police headquarters in downtown Providence. In the vernacular, Officer Gleckman was a "street cop." His beat often included the Pleasant View School area. There is no question that Pleasant View is a city school which serves the needs of the retarded or emotionally disturbed child. There is no compairson between the Iowa detective's intentional playing upon the emotions of a prisoner and Patrolman Gleckman's off-hand reference to Patrolman McKenna about Pleasant View's student body.

Even if I were to concede that defendant was "interrogated," I would not exclude the shotgun from evidence for, in my opinion, defendant voluntarily and intelligently waived his privilege against self-incrimination when he decided to lead the police to the shotgun. At this waiver stage the instant case loses any and all resemblance to the facts of *Brewer* v. *Williams.* In *Brewer* there was no "break in the action" after the subtle interrogation had commenced before

Williams led the police to the body. As Justice Powell noted, there was no evidence that the defendant voluntarily waived his rights, except the fact that statements eventually were obtained. 430 U.S. at 411, 97 S. Ct. at 1246, 51 L. Ed. 2d at 444, Powell, J., concurring.

The officer in charge of the early morning search for the individual who had held up the cab driver was Captain Leyden. He, along with a dozen other officers, had been searching for defendant since midnight because the cab driver, upon being brought to police headquarters, saw defendant's picture on a "Wanted" poster and immediately identified him as his assailant.

When defendant was arrested unarmed at 4:30 a.m., the logical inference was that he had secreted the shotgun nearby. The defendant was arrested about a block away from the Pleasant View School, and within a matter of a few hours the children would be making their way towards this institution. When defendant requested an attorney, all questioning ceased. And now defendant had returned to the scene and indicated a willingness to pinpoint the location of the dangerous weapon. Under the circumstances, what should Captain Leyden have done? I submit he did the only thing he reasonably could have done. The defendant was taken out of the police car and for the fourth time that evening was given the full panoply of constitutional protection due him. The captain then asked defendant if he understood these rights and received an affirmative answer. When defendant insisted on locating the shotgun, Captain Leyden directed that the search for the weapon begin. I would hold that the state has met its heavy burden of establishing that defendant voluntarily, knowingly, and intentionally relinquished his known rights. *See Johnson v. Zerbst,* 340 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938); *State v. Vargus,* 118 R.I. 113, 373 A.2d 150 (1977).

The views expressed by the majority come perilously close to fulfilling the worst fears of the four *Brewer* dissenters, who

expressed concern that the majority in *Brewer* was really holding that once a suspect has asserted his right not to talk without the presence of an attorney, "it becomes legally impossible for him to waive that right until he has seen an attorney." 430 U.S. at 418-19, 97 S. Ct. at 1249, 51 L. Ed. 2d at 449, Burger, C.J., dissenting. In fact, Justice Stewart took pains to deny this charge specifically and suggested that a valid waiver could have been found had the Des Moines detective prefaced his remarks by telling Williams that he had a right to the presence of a lawyer or otherwise made an effort to ascertain whether Williams wished to relinquish that right. 430 U.S. at 405-06, 97 S. Ct. at 1243, 51 L. Ed. 2d at 440-441. That, I suggest, is precisely what Captain Leyden did here. Justice Powell's concurring opinion is more emphatic on this point. He found "no justification" for the view of the Chief Justice:

> "On the contrary, the opinion of the Court is explicitly clear that the right to assistance of counsel may be waived, after it has attached, without notice to or consultation with counsel." 430 U.S. at 413, 97 S. Ct. at 1246, 51 L. Ed. 2d at 445.

Despite these explicit assurances found in *Brewer*, the majority finds no waiver following Captain Leyden's second rendition of the *Miranda* warnings. The rationale for this failure is based upon a somewhat novel interpretation of the "fruit of the poisonous tree" doctrine. In discussing the "fruit of the poisonous tree" concept, the United States Supreme Court has specifically limited the extent to which prior illegal police conduct must be considered responsible for the securing of incriminatory information.

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by

exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun* v. *United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441, 455 (1963); *Commonwealth* v. *Cunningham*, 471 Pa. 577, 586, 379 A.2d 1172, 1176-77 (1977).

Even assuming Officer Gleckman's concern about the Pleasant View student population was in fact an artfully executed interrorgation, I believe the police did not "exploit" the primary illegality, but instead "purged" the primary taint by taking the defendant out of the police car, placing him on the street, reading him for the fourth time his *Miranda* rights, and making sure he understood the consequences of his action. In response the defendant told Captain Leyden that he did understand what he was doing and then went out into the nearby field and located his weapon for the police. If this factual pattern does not constitute a valid waiver of one's fifth amendment rights, the worst fears of the *Brewer* dissenters have now been realized.

*Julius C. Michaelson*, Attorney General, *Nancy Marks Rahmes*, Special Assistant Attorney General, for plaintiff.

*William F. Reilly*, Public Defender, *Barbara Hurst*, Chief Appellate Attorney, *John A. MacFadyen III*, Assistant Public Defender, for defendant.