STATE

v.

Steven **VILLANI.**

No. 84–156–C.A.

Supreme Court of Rhode Island.

April 11, 1985.

Arlene Violet, Atty. Gen., Marc DeSisto, Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

KELLEHER, Justice.

Mike's Diner was and is a source of salutary sustentation to those who find themselves in downtown Providence after dark. During the day the diner is parked on Rathbone Street in an area called Farmers' Market. Much of the diner's bill of fare is prepared in a nearby kitchen. As darkness approaches, the diner is towed by truck from Rathbone Street and ultimately parked alongside the curb of one of downtown's thoroughfares. The daily routine just described has taken place for many years.

At approximately 7:15 p.m. on November 17, 1982, Joseph M. King (King) had a date for a game of pool somewhere downtown with his brother. King is one of the diner's short-order cooks. As was his habit, whenever King headed toward downtown Providence from his residence, he drove through the market area to see what might be going on at the kitchen. The diner was nowhere to be seen, but a car belonging to James Russell (Russell) was parked nearby. Russell was a part owner of the diner.

King left his car and entered the kitchen with thoughts of sharing a chat with the boss. Immediately upon entering, he observed the body of Russell lying on the kitchen floor. The police were summoned, and the coroner's examination indicated that Russell had been shot three times, once in the abdomen and twice in the back.

At one time defendant, Steven Villani (Villani), who was twenty-five years of age when Russell was murdered, had worked at the diner as a "counterperson." At a Superior Court jury trial, his mother-in-law told the jury of Villani's complaint that the diner's owners owed him back wages. She

also testified that her son-in-law had a gambling habit and that Villani and his wife and children resided at her home. Late in the evening of November 17, 1982, when the television station flashed news of the murder at Mike's Diner, she suspected that her son-in-law was the culprit; after disclosing her suspicions, he admitted his involvement in the incident.

The next morning the mother-in-law talked to members of the Providence police department, a warrant for the arrest of Villani was issued, and at about 4 p.m. Villani was arrested by the Cranston police. He was subsequently taken by two Providence detectives from Cranston to Providence police headquarters; and in a signed, typewritten statement given to the police, Villani explained that he had gone to the diner's kitchen with specific intent to "rob Jimmy." When he entered the kitchen, he encountered the deceased. According to Villani's statement, Russell then approached him with a knife in hand, and the defendant thought he was about to be stabbed. Villani fired his gun, inflicting a stomach wound, and as Russell lay on the floor, he fired two more shots into the deceased's back. He took $700 or $800 in cash from the deceased's pants pocket and left the area. He then drove to a nearby racetrack where he lost the loot betting on the wrong greyhounds.

At trial both detectives testified that after the typewritten statement had been executed, Villani told them that when he first entered the kitchen, he was wearing a mask, but after the first shot was fired, Russell grabbed the mask from Villani's face. Villani went on to explain that he fired the next two shots "to finish him off." He had borrowed the weapon, a .22-caliber pistol, from a friend on the pretext of eradicating a rat problem at his mother-in-law's home. Villani told the police that on a previous day he had driven to the kitchen, armed with the pistol, but then developed a case of "cold feet" and left the area.

Approximately two months after Villani's arrest, a Providence County grand jury returned a three-count indictment which charged Villani with murder, robbery, and the illegal possession of the pistol. Subsequently, in September 1983 a Superior Court jury, after listening to six days of testimony, returned guilty verdicts as to all three charges. Later, the trial justice, after first denying Villani's motion for a new trial, imposed a life sentence on the murder conviction; a consecutive twenty-year sentence on the robbery conviction, with ten years to be served and the balance of the sentence being suspended, with Villani being on a probationary status during the ten-year suspension period; and a one-year sentence on the weapons charge, which was to be served consecutively with the life sentence and concurrently with the robbery sentence.

In his appeal Villani raises three issues. He faults the trial justice for permitting the chief medical examiner to testify about the cause of Russell's death, to wit, "multiple gunshot wounds" and the circumstances surrounding that death, to wit, "homicidal." He also challenges the trial justice's admission of the typewritten statement given to the Providence detectives during Villani's interrogation. The final alleged error occurred when in his charge the trial justice defined felony murder. The first two errors merit little discussion. The same cannot be said for the third.

Doctor William Q. Sturner, the state's chief medical examiner, testified at trial and, as noted earlier, gave his opinion concerning the cause and manner of Russell's death. Villani complains that the trial justice abused his discretion in permitting Dr. Sturner's testimony because the prosecutor failed to adequately qualify him as an expert.

It is well-settled law that the qualification of an expert witness and the matters to which he may testify are considerations within the sound discretion of the trial justice, and a ruling in this area will not be disturbed on review absent a clear

abuse of discretion. *State v. Ashness*, R.I., 461 A.2d 659, 670 (1983). Prime considerations in determining whether a witness is qualified include evidence of the witness's education, training, employment, or prior experiences.

■ Rhode Island's chief medical examiner, by the terms of G.L.1956 (1979 Reenactment) § 23–4–5, is required to be a duly licensed "physician" and "a qualified pathologist, certified in anatomical pathology by the American Board of Pathology and who has had forensic training or experience." Doctor Sturner testified that he had been the state's chief medical examiner for 9½ years. We have no doubt that Dr. Sturner at the time of his appointment satisfied the statutory mandate and that his 9½ years of on-the-job training amply qualified him to express the opinions that he did.

The thrust of Villani's motion to suppress the signed, typewritten statement and oral admissions made to two Providence detectives, Officers Guido Laorenza and Arnold Shone, revolves about a printed form used by the police. The form indicates that the suspect was advised of his four *Miranda* rights; that he was not required to give any statement; and that he could have an attorney present during any confrontational lineup. The last two items on the form, numbered 7 and 8 respectively, are admissions by the suspect—in this case Villani—that, having been informed of his constitutional rights, he (1) understood those rights and agreed to give a statement and (2) did not desire the presence of any private or appointed counsel while he was giving his statement. The form indicates that Villani initialed each one of the eight statements that appear there. It is also quite clear that a big X has been drawn through items 7 and 8.

Evidence taken at the suppression hearing indicated that when the two detectives encountered Villani at the Cranston police station, Detective Laorenza was greeted by Villani with "Guido, what's up?" The testimony indicated that Detective Laorenza had met Villani working as a counterman

in at least two of the restaurants he patronized. The time between the beginning and the conclusion of the taking of the statement was approximately 3½ hours. Detective Laorenza acknowledged that his speed as a typist left much to be desired. At one point when Villani became concerned that someone in the station was listening in on his telephone conversations, to accommodate the suspect, he was taken to an outside telephone booth where he made another one of his estimated six to ten calls.

Both detectives made it clear that at the station Villani had no difficulty with six of the eight items on the form. However, he was concerned with item 8's reference to the lack of any desire to have an attorney present at the time the statements were given. The detectives explained that Villani's concern was whether, by initialing item 8, he was forfeiting any right to have an attorney in court. They then explained to Villani that he could have one in court or he could have one "right now," and if he desired, a representative of the public defender's staff would be summoned to the station. Detective Laorenza asked Villani if it would make him "feel comfortable" if he crossed out items 7 and 8, and after getting an affirmative answer, the Xs were added. However, both officers were convinced that Villani was well aware that if he desired an attorney at any time during the statement-taking, his request would be honored. The record additionally reveals that Villani successfully suspended the statement taking a number of times. The detectives were more than responsive to his numerous demands to use the phone, and, upon request, he was provided soft drinks, snacks, and the use of bathroom facilities.

■ In denying the motion to suppress, the trial justice found that the state had proved by clear and convincing evidence that Villani had indeed made a knowing, intelligent, and voluntary waiver of his Fifth Amendment rights. This court, in reviewing such a denial, examines the evidence in the light most favorable to the

state to determine whether the trial justice's findings were clearly wrong. *State v. Verlaque*, R.I., 465 A.2d 207, 210 (1983); *State v. Benton*, R.I., 413 A.2d 104, 109 (1980). We have examined the record in light of the rule set forth above and do not hesitate to affirm the denial of Villani's suppression motion.

In his instructions to the jury, the trial justice charged on first-degree murder, second-degree murder, and felony murder. He explained to the jury that a guilty verdict of first-degree murder could be returned if the panel found an unlawful killing done with malice aforethought and in a willful, deliberate, malicious, and premeditated manner. He then defined second-degree murder. The difference between first-degree, premeditated murder and second-degree, premeditated murder is the time lag between the formation of the homicidal intent and the killing itself. If that intent is more than momentary, the murder is first degree; if the intent had a momentary existence, a finding of murder in the second degree is warranted. *State v. Clark*, R.I., 423 A.2d 1151, 1161 (1980). When he discussed felony murder, the trial justice told the jury that if it was to render a guilty verdict under the felony-murder theory, it must find that all the elements of first-degree murder were established beyond a reasonable doubt and also that the killing occurred while Villani was robbing or attempting to rob Russell. Villani's trial counsel objected to the trial justice's conception of felony murder and lodged another objection to his failure to give any of the requests to charge on felony murder that had been submitted to the court by the defense. There is merit in this portion of Villani's appeal.

■ Our homicide statute, G.L.1956 (1981 Reenactment) § 11–23–1, defines murder as the "unlawful killing of a human being with malice aforethought." In its pertinent provisions, the statute goes on to define first-degree murder as "[e]very murder perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious and premeditated killing, or committed in the perpetration of, or attempt to perpetrate any arson * * * rape, burglary or robbery * * *." In this jurisdiction the felony-murder theory, simply stated, is that any homicide committed while perpetrating or attempting to perpetrate any of the enumerated felonies is first-degree murder. Such a homicide acquires first-degree-murder status without the necessity of proving such elements as premeditation and deliberation. It has been said that the intent necessary to sustain a murder conviction is implied by operation of law even though the defendant may not have had any intent to kill. *People v. Gladman*, 41 N.Y.2d 123, 125, 390 N.Y.S.2d 912, 914, 359 N.E.2d 420, 422 (1976). Similar sentiments have been expressed in *Newton v. State*, 280 Md. 260, 268–69, 373 A.2d 262, 267 (1977), where the Maryland Court of Appeals noted that in a felony-murder prosecution proof of every element of the underlying felony establishes the element of malice that is necessary for murder, and there is no need to prove the usual elements of deliberation and premeditation. *See also*, 2 Wharton's *Criminal Law* § 145 at 204 (14th ed. 1979). We will eschew reliance on any such legal niceties as expressed in *Gladman* and *Newton* and rule that felony murder is murder in the first degree simply because the Legislature has said so. A first-degree-murder conviction, be it of a willful, malicious, premeditated killing or a felony murder, calls for the mandatory imposition of at least a life sentence.

■ It is clear that the trial justice in the felony-murder portion of his charge erred.[1] Villani's appellate counsel also re-

---

1. The trial justice's insistence on proof of a first-degree, premeditated killing as well as proof of a robbery might be attributable to certain language found in *State v. Innis*, 120 R.I. 641, 391 A.2d 1158 (1978). In speaking of the felony-murder theory, the court observed: "The law is clear in cases of felony murder. In order to obtain a conviction, the state must prove all of the elements of the underlying felony, in addition to the other elements of murder, be-

minds us that in *State v. Innis,* 120 R.I. 641, 657–58, 391 A.2d 1158, 1167 (1978), this court stressed that the constitutional guarantee against double jeopardy prohibits the conviction of a defendant of both murder in the first degree under a felony-murder theory and the underlying felony. We acknowledge the holding in *Innis* and also point out that the court in *Innis* stressed the necessity that where the jury is charged as to its ability to return a first-degree-murder verdict based either on willful, deliberate, premeditated murder or on a felony-murder theory, the trial justice must take pains to determine the basis for the jury's finding. Thus, we now turn to the record to determine whether the trial justice complied with this dictate.

The trial justice prepared a document that was to be used by the foreman when he announced the jury's verdict. The document was entitled "Jury Verdicts"[2] and posed five different questions, each of which required checking either a "guilty" or a "not guilty" response. The first question was directed to the charge of first-degree, premeditated murder, and the response checked was "guilty." The second inquiry was directed to felony murder. However, no response was possible to this inquiry because the jury was directed that if its response to the first inquiry was guilty, it should skip questions 2 (felony murder) and 3 (second-degree murder) and go on to questions 4 and 5, which dealt with, respectively, the robbery and weapons charges. The jury did as ordered and checked "guilty" responses to questions 4 and 5. The responses to questions 1 and 4 clearly indicate that the jury found Villani guilty of committing a deliberate, premeditated murder and a robbery.

■ Having in mind the erroneous charge as well as the composition of the

jury-verdict form with its foreclosure of any response to the felony-murder inquiry, we are truly perplexed as to what actually transpired in the jurors' minds when they considered the evidence in the light of the charge. It is conceivable that the jurors, by answering "guilty" to inquiry numbered 1, which sets forth the elements of first-degree, premeditated murder, and responding "guilty" to query numbered 4, were of the belief, in light of the trial justice's erroneous instruction, that they were actually finding Villani guilty of felony murder. Since there is doubt about the actual intent of the jury, we shall, in light of the admonition in *State v. Innis,* avoid the risk of a violation of the constitutional guarantee against double punishment for the same offense by following the path taken by the Maryland Court of Appeals in a somewhat similar situation in *Newton v. State* and affirm the murder conviction on the assumption that the jury's verdict was based on the felony-murder theory and also affirm the weapons conviction, but order that, upon remand, the robbery conviction be vacated and dismissed.

Accordingly, the defendant's appeal is denied in part and sustained in part, the judgments of conviction as they relate to the murder and weapons charges are affirmed, and the judgment of conviction entered on the robbery count is vacated and dismissed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

### APPENDIX

STATE OF RHODE ISLAND ⦂

V. ⦂ C. A. No. 83–0204

STEVEN VILLANI ⦂

#### JURY VERDICTS

1. As to the charge in the Indictment charging defendant, Steven Villani, with the unlawful, wilful, delib-

---

yond a reasonable doubt." *Id.* at 656, 391 A.2d at 1166. Cited as support for this proposition was *Newton v. State,* 280 Md. 260, 268–69, 373 A.2d 262, 266–67 (1977). What the Maryland Court of Appeals actually said was this: "Therefore, to secure a conviction for first degree

murder under the felony murder doctrine, the State is required to prove the underlying felony and the death occurring in the perpetration of the felony." *Id.* at 269, 373 A.2d at 267.

2. *See* Appendix.

erate, malicious and premeditated killing of James Russell with malice aforethought on or about November 17, 1982, how do you find the defendant?

Check One    NOT GUILTY _____

             GUILTY    ✓

2. If your verdict is "Guilty" as to question 1 above, do not answer this question nor question 3 and go on to answer questions 4 and 5.

   If however your verdict is "Not Guilty", how do you find defendant on the offense of the unlawful killing of James Russell committed in the perpetration or attempted perpetration of a robbery on or about November 17, 1982?

   Check One    NOT GUILTY _____

                GUILTY    _____

3. If your verdict is "Not Guilty" in questions 1 and 2 above, how do you find the defendant on the offense of second degree murder of James Russell on November 17, 1982?

   Check One    NOT GUILTY _____

                GUILTY    _____

4. If your verdict in question 2 above is "Guilty", do not answer this question. If however your verdict is "Not Guilty" to question 2, how do you find the defendant on the charge in the Indictment of robbery of James Russell on November 17, 1982?

   Check One    NOT GUILTY _____

                GUILTY    ✓

5. As to the charge in the indictment charging defendant, Steven Villani, with carrying a pistol without a license on November 17, 1982, how do you find the defendant?

   Check One    NOT GUILTY _____

                GUILTY    ✓