April 4, 2023

**Supreme Court**

No. 2021-139-C.A.
(P1/19-820AG)

State                              :

v.                              :

Juan Gibson.                              :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                              :

Juan Gibson.                      :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**  The issues in this appeal arise from two separate home invasions that occurred at the residence of Jeffrey Lebrun in May and July of 2013, the latter of which resulted in his death.  In January 2020, a jury convicted the defendant, Juan Gibson, of six criminal counts related to these two incidents.  The defendant now appeals from that judgment of conviction and commitment.  Specifically, the defendant asserts that the trial justice erred by omitting a jury instruction on the specific-intent element of robbery and by denying the defendant's motion for judgment of acquittal and his motion for a new trial.  For the reasons set forth herein, we affirm the judgment of the Superior Court.

# I

# Facts and Travel

In March 2013, Jeffrey moved with his family—his wife, Sheri, and his stepdaughter, Sedina (then fifteen years old)—to 112 Dawson Street in Pawtucket.[1, 2] The Lebruns' elder daughter, Alexis (then eighteen years old), did not reside with the family at the time of the pertinent events, but lived with a friend nearby.

To supplement his income, Jeffrey began growing marijuana in his basement and selling the product to both medicinal and recreational users. Jeffrey kept the cash proceeds of his business in a Gardall safe on the second floor of the house near his bedroom. Although Sheri, Sedina, and Alexis all knew about the business, Jeffrey maintained exclusive control over the money. In fact, Jeffrey and Sheri regularly fought over finances because Jeffrey would refuse to give Sheri money.

According to Sedina and Sheri, Jeffrey did not keep his lucrative marijuana business a secret. Sedina testified that Jeffrey would readily share with others the nature of his business. Alexis testified that she too posted about Jeffrey's marijuana business on social media and would discuss his financial success in conversations with others.

---

[1] The essential facts of the case are not disputed. We recite only the facts necessary to follow the analysis of the legal issues presented to this Court on appeal.
[2] To avoid confusion, we refer to Jeffrey Lebrun, Sheri Lebrun, Sedina Lebrun, and Alexis (Lebrun) Jordan by their first names. No disrespect is intended.

One person who became particularly privy to the details of Jeffrey's business was Lisa Silva. Silva first became friends with Alexis, but she eventually befriended the entire Lebrun family. The defendant was Silva's boyfriend at the time and the father of her children.

Alexis testified that, when she socialized at Silva's home, defendant would often be "in and out" of the room during conversations about Jeffrey and the Lebrun family. Sedina testified that defendant visited the Lebruns' home at least once to talk to Jeffrey, presumably about the marijuana business. Sheri testified that defendant had purchased marijuana from Jeffrey before and that he knew about the marijuana business at Dawson Street.

## May 19, 2013

On the night of May 18, 2013—and into the early morning hours of May 19—Sedina went to bed in her room on the first floor of the Lebruns' home while Jeffrey played video games in the adjacent room. Sheri was asleep in the bedroom upstairs. Between 1 a.m. and 1:30 a.m., Sedina and Sheri awoke to loud noises and the sound of Jeffrey screaming. When Sheri ran downstairs, she saw Jeffrey struggling with a person wearing a black sweatshirt and a black ski mask. During the physical struggle with the intruder, Jeffrey wrestled away a knife. The intruder then ran out the back of the house.

Sedina stayed in her room during the intrusion. When she emerged, Sedina testified, her stepfather looked like "a mess" and "there was blood all over him" from what appeared to be stab wounds.

First on the scene was Pawtucket Police Patrol Officer William Briggs, responding to a 1:48 a.m. 911 call. Jeffrey told Officer Briggs that two intruders dressed in black and wearing ski masks had attacked him. When Officer Briggs arrived, there was a black backpack in the living room that the Lebruns did not recognize. Sedina testified that she saw Jeffrey rummaging through the backpack, assuming it had been left behind by the intruder.

In response to the 911 call, the Pawtucket police also dispatched Officers Eric Bucka and Robert Pickett to search the surrounding area for suspects. At approximately 1:56 a.m., Officer Bucka encountered a man, defendant, walking down County Street about a block and a half from the Lebruns' house. Officer Bucka stopped defendant for questioning; at the time, defendant was wearing a white T-shirt and black pants. Officer Bucka explained to the court that he stopped defendant because, aside from the white T-shirt, defendant matched the description of the suspect in the home invasion. After defendant answered their questions, Officer Bucka and Officer Pickett confirmed that there were no warrants outstanding for defendant's arrest, and they let him leave.

Mark Theroux, a detective sergeant with the Pawtucket Police Department, reported to the scene and seized the backpack that the Lebruns had found in their living room, along with the knife and two nitrile gloves, the latter of which were found in the driveway. Detective Theroux reported that the backpack contained: one ball-peen hammer, five large wire or "zip" ties, clear packaging tape, one hand towel, one center-punch tool, one glass-cutter tool, one flathead screwdriver, and eight coiled pieces of clothesline or cords tied into slip knots.[3] These items were submitted for DNA testing.

Later in the morning of May 19, 2013, Pawtucket Patrol Officer Carl Barovier received a call from an elderly neighbor of the Lebruns, alerting him that she had found a black sweatshirt in her yard that morning, which she presumed someone had thrown over her fence. Officer Barovier collected the sweatshirt and drove it back to the Lebruns for identification. Sheri and Jeffrey both told Officer Barovier that the sweatshirt looked like the one the intruder wore the night of the assault.

## July 28, 2013

Toward the end of July 2013, Sheri set out to plan a party at the Lebruns' home for Alexis to celebrate her moving into a new apartment. Sheri asked Jeffrey for money to host the party. He initially agreed, but then later reneged on his

---

[3] Tamara Wong, a forensic scientist and key expert witness, later testified to her examination of a paper towel that was also found in the backpack, although Detective Theroux did not mention this paper towel in his testimony.

promise, which led to an argument. Sheri admitted in her testimony to feeling "pretty angry" and "ticked," feelings that she shared with Alexis and Silva while the three were at Silva's apartment. The defendant was home at the time, and Alexis testified that he was "in and out" of the room when Sheri aired her frustrations about Jeffrey.

During the investigation following Jeffrey's murder, Sheri conveyed in a handwritten statement to the police that she communicated her frustrations about Jeffrey's refusal to pay for the party to Silva and defendant. She also stated that she had told Silva that she "wished someone would teach [Jeffrey] a lesson," and that "someone bigger" should give Jeffrey "a beating[,]" and that defendant was present during these statements.

Jeffrey ultimately agreed to pay for the party. The Lebruns held the party at their home in the backyard on the afternoon of July 27, 2013. After the party, Sheri and Alexis made plans to go out, while Sedina and Jeffrey stayed home.

Sedina testified that she went to bed around 10 p.m. or 11 p.m. and fell asleep while her stepfather stayed awake. Sedina then testified that she awoke to loud noises emanating from the living room, including Jeffrey's voice yelling. Jeffrey, locked in a fight with another person, then crashed through the door of Sedina's bedroom. Sedina testified that, when Jeffrey and the intruder fell into her room, she got a brief look at the intruder, noting that the person was male, tall, skinny, and

dressed in black. Jeffrey and the intruder backed out and carried on with the fight in the living room.

Sedina, still in her room, then testified that she heard "about three" gunshots, following which she heard Jeffrey "make sort of a groaning noise * * *." She then heard the sounds of footsteps from two people and a "dragging noise." Eventually, everything went silent. Soon after, Sedina heard sirens and police officers arriving at the house.

The police had responded to a 911 call made by the Lebruns' neighbor, Jessica Parker. Parker testified that she heard what she thought to be "about six" gunshots. As she turned to look where the noise was coming from, she spotted a man running from the back of the Lebruns' house, up the driveway, and along Dawson Street toward Newport Avenue. Parker testified that the man she saw was wearing black pants and a black hoodie with the hood raised over his head.

About twenty to thirty seconds later, Parker saw a second male, dressed in all black, run out of the house and along Dawson Street toward Newport Avenue, in the same direction as the first man. Parker testified that the second man appeared to have his hand underneath his hoodie, as if holding something tight to his side. Parker and her then-fiancé got in their car and attempted to follow the two achromatically clad runners, but soon lost sight of them. Parker then called 911.

The first officers on the scene attempted to enter the Lebruns' home through the front and side doors, which were both locked, but eventually they made entry through the open back door. The officers found Jeffrey in the living room with visible gunshot wounds to the torso and head. Jeffrey was not breathing and had no pulse. The officers called for a rescue. Paramedics arrived and pronounced Jeffrey dead at the scene.

## DNA Evidence

Tamara Wong, Principal Forensic Scientist at the Rhode Island Department of Health Forensic Science Laboratory, performed the DNA analysis on the evidence collected from the May and July crime scenes and testified to her findings at trial.[4]

## Evidence from May 19, 2013

First, Wong analyzed the collar of the black sweatshirt found near the Lebruns' home after the May intrusion, in hopes of identifying the wearer. Wong found that the likelihood that defendant's DNA was on the sweatshirt collar was 232 quintillion, or that it was 232 quintillion times more likely than not that defendant's DNA was part of the DNA mixture found on the sweatshirt.

---

[4] Wong's testimony was uncontested. She testified extensively about general best practices for analyzing DNA evidence as well as the particular procedures she followed when conducting the DNA analyses in this case. This opinion recounts only the facts and evidence pertinent to the legal issues before this Court on appeal.

Next, Wong analyzed the nitrile gloves found in the Lebruns' driveway and discovered mixed DNA profiles on both gloves. Wong testified that it was 474 billion times more likely than not that the DNA mixture on one of the gloves included defendant's DNA.

Then, Wong conducted an analysis of the backpack left in the living room. The analysis of the backpack showed several mixed DNA profiles from two people, but none that Wong could specifically identify.

Wong also tested the objects found inside the backpack, including a paper towel and eight pieces of cord.[5] On the paper towel, Wong found that there were two DNA contributors. Ultimately, she concluded that it was 20 quadrillion times more likely than not that defendant's DNA was part of the DNA mixture found on the paper towel.

Finally, Wong analyzed the eight pieces of cord found in the backpack. Only three cords produced DNA profiles ripe for analysis; however, of those three, Wong determined that it was 965 trillion times more likely than not that defendant's DNA was part of the DNA mixture found on one of the cords.

---

[5] Other items found in the backpack included a hammer, hand towel, flathead screwdriver, zip ties, center-punch tool, glass cutter, and packing tape. Some of these items contained insufficient amounts of DNA for full analysis; others yielded results that did not identify defendant or any other specific DNA contributors.

**Evidence from July 28, 2013**

In 2019 Wong analyzed the physical evidence retrieved from the Lebruns' house after the murder. This physical evidence included samples of fingernail clippings from Jeffrey.

Wong's analysis of the fingernail clippings revealed that it was 279 trillion times more likely than not that the DNA found on the fingernails came from Jeffrey and defendant than from Jeffrey and some other, unknown individual.

**The Indictment**

On March 1, 2019, a grand jury returned an indictment against defendant on eight counts: burglary of a dwelling house, in violation of G.L. 1956 § 11-8-1 (count one); conspiring to commit robbery, in violation of G.L. 1956 § 11-1-6 (count two); assault with a dangerous weapon in a dwelling house, in violation of G.L. 1956 § 11-5-4 (count three); first degree murder, to wit, felony murder, during the course of an inherently dangerous felony (attempted robbery), in violation of G.L. 1956 § 11-23-1 and § 11-23-2 (count four); conspiracy to commit robbery, in violation of § 11-1-6 (count five); discharging a firearm while committing a crime of violence (murder), in violation of G.L. 1956 § 11-47-3.2(b)(4) (count six); carrying a pistol without a license in violation of § 11-47-8(a) (count seven); and possessing a firearm after having been convicted of a felony in violation of § 11-47-5 (count eight). Counts one through three were charged in connection with the May 19, 2013

incident; counts four through eight were charged in connection with the July 28, 2013 incident.

On January 6, 2020, the state dismissed counts seven and eight pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. After trial, the jury returned a verdict of guilty against defendant on all remaining counts.

After the state rested its case, defendant moved for a judgment of acquittal. The trial justice denied the motion. Shortly thereafter, defendant filed a motion for a new trial. The trial justice denied the motion and sentenced defendant on July 29, 2020.

For the counts related to the events of May 19, 2013, the trial justice sentenced defendant to serve concurrent terms of forty years for the burglary, ten years for the conspiracy to commit robbery, and forty years to serve for the assault with a dangerous weapon.[6] For the counts related to the events of July 28, 2013, the trial justice imposed two consecutive life sentences for the felony murder and discharging a firearm, as well as ten years, to be served concurrently to counts one, two, and

---

[6] The sentence ultimately imposed by the trial justice does not align with the sentence as recorded on the judgment of conviction, which denotes a twenty-year sentence for the burglary charge (count one) and the assault with a dangerous weapon charge (count three), to be served concurrently with the first conspiracy charge (count two). Neither party disputes the final sentence, but we acknowledge the discrepancy in the record for accuracy.

three, for the conspiracy to commit robbery. In total, the Superior Court imposed a sentence of two consecutive life sentences plus a consecutive forty years to serve.

The defendant filed a premature but timely notice of appeal to this Court on July 29, 2020. A judgment of conviction and commitment then entered on September 15, 2020.

## III

## Discussion

On appeal, defendant first argues that the trial justice's jury instruction on robbery created reversible error. The defendant then argues that the trial justice erred in denying his motion for judgment of acquittal and his motion for a new trial.

## A

## Jury Instructions

The defendant asserts that the trial justice committed reversible error by failing to instruct the jury on the specific-intent element of robbery. The state rebuts this argument by noting that it did not charge defendant with robbery per se but, instead, with other felonious acts that require an intent, conspiracy, or attempt to rob. Such offenses, the state advances, do not require the particularity of instruction that defendant demands on appeal.

Before we reach the merits of defendant's claim of error by the trial justice, we first address the state's contention that defendant failed to properly preserve his objection for appellate review.

"It is well settled that the raise-or-waive rule precludes us from considering at the appellate level issues not properly presented before the trial court." *State v. Andrade*, 209 A.3d 1185, 1194 (R.I. 2019) (quoting *State v. Cahill*, 196 A.3d 744, 753 (R.I. 2018)). "No party may assign as error any portion of the [jury instructions] or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." Super. R. Crim. P. 30. "The purpose of Rule 30 is to notify the trial justice, with clarity and specificity, of any deficiencies in the charge so that the alleged error may be cured before the jury retires for deliberations." *State v. Gautier*, 950 A.2d 400, 415 (R.I. 2008) (quoting *State v. Brown*, 898 A.2d 69, 83 (R.I. 2006)).

"[W]aiver of an issue on appeal is often based on our well-settled requirement that objections must be sufficiently specific 'as to call the trial justice's attention to the basis for said objection.'" *State v. Soler*, 140 A.3d 755, 760 (R.I. 2016) (quoting *State v. Brown*, 9 A.3d 1240, 1245 (R.I. 2010)).

At trial, upon request for any objections to the proposed jury instructions, defendant submitted written objections to the trial justice. During the subsequent

hearing, defendant advised the trial justice as follows, "Your Honor, I did file a written copy of my objections * * *. I would just like to incorporate those for the record * * *." The trial justice noted the objection. After the trial justice noted the objection, the jury retired for deliberations.[7] On appeal, the state attacks the specificity of defendant's objection, claiming that defendant's general reference to the lengthy written objections he submitted failed to alert the trial justice to the precise nature of his objection.

We observe that not only did the trial justice note defendant's objection, but also that defendant clearly disputed the trial justice's omission of the specific-intent element of robbery in his written objections. *See State v. Oliveira*, 882 A.2d 1097, 1121 (R.I. 2005) (affirming a trial justice's decision to refuse a jury instruction where the requesting party did not submit the requested instruction in writing and the issue was otherwise adequately covered); *State v. DeCiantis*, 501 A.2d 365, 369 (R.I. 1985) (holding that an issue was not adequately preserved on appeal where counsel merely "[o]bject[ed] by number" to the jury charge). This Court perceives no error with either the timeliness or specificity of defendant's objection. The objection to the jury instruction on robbery is not waived; therefore, we proceed with our review.

---

[7] We note the order of events and recognize that defendant timely raised the objection. *See State v. Maria*, 132 A.3d 694, 700 (R.I. 2016).

- 14 -

## Standard of Review

We review "jury instructions on a *de novo* basis." *State v. Isom*, 251 A.3d 1, 6 (R.I. 2021) (quoting *State v. Ros*, 973 A.2d 1148, 1166 (R.I. 2009)). "It is well settled that this Court 'reviews jury instructions in their entirety' and 'we will affirm if the instructions adequately cover the law and neither reduce nor shift the state's burden of proof.'" *State v. Martin*, 68 A.3d 467, 473 (R.I. 2013) (brackets omitted) (quoting *State v. Lopez*, 45 A.3d 1, 22 (R.I. 2012)).

## Analysis

The defendant argues that the trial justice committed reversible error by omitting the specific-intent element of robbery from her instructions to the jury. Specifically, defendant alleges that the flawed instruction interfered with the jury's ability to decide count one (burglary); count three (assault with a dangerous weapon in a dwelling house with the intent to rob); count four (felony murder during an attempted robbery); and counts two and five (conspiracy to commit robbery). Because all of these counts involve either an intent to, conspiracy to, or attempt to rob, defendant avers that the trial justice was required to instruct the jury on all elements of robbery. Her failure to do so, defendant argues, improperly reduced the state's burden of proof, violated defendant's constitutional rights, and created reversible error necessitating a new trial.

- 15 -

In her jury instructions, the trial justice provided the common-law definition of robbery: "Robbery is a felony. It is defined as the taking of money or goods of any value from the person of another, or in his presence, against his will, by violence or by putting him in fear." The common-law definition is the legal definition of robbery in Rhode Island. *See State v. Robertson*, 740 A.2d 330, 333 (R.I. 1999) ("This Court has long held that the [penalty for robbery] statute [(G.L. 1956 § 11-39-1)] incorporates the common-law definition of robbery."); *see also State v. Shepard*, 726 A.2d 1138, 1140 (R.I. 1999); *State v. Domanski*, 57 R.I. 500, 501, 190 A. 854, 855 (1937). Our caselaw additionally instructs that the specific-intent element of robbery is "to deprive another wholly and permanently of his property." *State v. Hazard*, 745 A.2d 748, 755 (R.I. 2000) (quoting *State v. Robalewski*, 418 A.2d 817, 821 (R.I. 1980), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990)). This is an essential element of the crime. *See State v. Brown*, 549 A.2d 1373, 1377 (R.I. 1988); *Robalewski*, 418 A.2d at 821.

Jury instructions curtail a defendant's right to due process when the instructions reduce the state's burden to prove every element of the crimes charged beyond a reasonable doubt. *See State v. Whitaker*, 79 A.3d 795, 808 (R.I. 2013) ("The state * * * carries the burden of producing enough evidence so that * * * the defendant's guilt has been proved beyond a reasonable doubt as to each element or component *of the crimes charged*." (brackets omitted) (emphasis added)); *State v.*

- 16 -

*Sivo*, 925 A.2d 901, 915 (R.I. 2007) ("[T]he 'Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements *of the crime with which he is charged*.'" (emphasis added) (quoting *United States v. Booker*, 543 U.S. 220, 230 (2005))); *Hazard*, 745 A.2d at 751 ("The Due Process Clause of the Fourteenth Amendment to the United States Constitution * * * den[ies] the state the power to deprive the accused of liberty unless the state proves every element necessary to constitute *the crime charged* beyond a reasonable doubt." (emphasis added)).

The focus of our inquiry must then be solely on the crimes charged against defendant and the elements of those crimes—particularly, as defendant has put at issue here, the requisite mental state for each crime. *See* 1 *Wharton's Criminal Law* § 5.1 (Ohlin 16th ed. Sept. 2022 update) ("[A] crime consists in the concurrence of prohibited conduct and a culpable mental state. Each crime * * * has its own type of culpable mental state (often called mens rea).").

Before this Court, the state concedes that the trial justice did not instruct the jury on the specific-intent element of robbery. The state also does not dispute that the intent to wholly and permanently deprive is an essential element of robbery. Rather, the crux of the state's argument is that the specific-intent instruction was superfluous based on the charges brought. To bolster this argument, the state notes that defendant fails to cite any caselaw from this Court that requires a robbery

- 17 -

specific-intent instruction for the crimes of burglary, assault with a dangerous weapon, felony murder, or conspiracy. The state maintains, therefore, that the omission of the specific-intent instruction did not in any way reduce its burden or constitute reversible error.

In response, defendant claims that the jury needed the specific-intent instruction for robbery to decide the following charges: burglary (count one); assault with a dangerous weapon in a dwelling house (count three); felony murder in the first degree, during the course of an attempted robbery (count four); and conspiracy (counts two and five). We review each of these counts in turn to determine whether the omission of the specific-intent instruction in any way reduced the state's burden of proof.

### Burglary

Rhode Island law incorporates the common-law definition of burglary. *See State v. Lefebvre*, 609 A.2d 957, 958 (R.I. 1992); *State v. Hudson*, 53 R.I. 229, 230, 165 A. 649, 650 (1933). "Burglary at common law is the breaking and entering the dwelling-house of another in the nighttime with the intent to commit a felony therein, whether the felony be actually committed or not." *State v. Contreras-Cruz*, 765 A.2d 849, 852 (R.I. 2001) (quoting *Hudson*, 53 R.I. at 230, 165 A. at 650).

To complete the crime of burglary, a defendant need only possess felonious intent "at the critical time of breaking and entering," regardless of whether the

underlying felony was separately completed. *See, e.g.*, *Contreras-Cruz*, 765 A.2d at 853, 855 (upholding a burglary conviction where sufficient evidence existed to prove that the defendant intended to commit sexual assault, a felony, upon entering the victim's bedroom without permission); *Lopes v. State*, 111 A.3d 344, 351 (R.I. 2015) (upholding a burglary conviction even though the underlying felony, larceny, had not been proven because "it is the *intent to commit a felony* that is the essential element of the crime of burglary" (emphasis added)); *State v. Dyer*, 813 A.2d 71, 76 (R.I. 2003) (upholding a burglary conviction against the defendant because his assault of the victim established a felonious intent to kill, even though the defendant failed to complete the murder).

Here, defendant insists that the omission of the specific-intent instruction for robbery, the underlying felony to his burglary charge, reduced the state's burden of proof. This argument confuses the temporal aspect of intent for burglary as opposed to robbery. The specific intent for robbery reflects the mental state of an accused at the moment of asportation or taking. *See State v. Firby*, 636 A.2d 1330, 1331 (R.I. 1994) (affirming that the pertinent intent for robbery is "at the time of * * * dispossession"). Whereas, for burglary, the relevant intent exists at the moment of breaking and entering. *See Lefebvre*, 609 A.2d at 960 ("It is most important to note that the burglary was complete at the time the breaking and entering took place with the felonious intent.").

As such, to decide the burglary charge, the jury did not require an instruction on the specific-intent element of robbery. For count one, the state's sole burden was to prove beyond a reasonable doubt that, at the moment defendant crossed the threshold into the Lebruns' home on the night of May 19, 2013, he intended to commit a felony—in this case, robbing Jeffrey. *See Lopes*, 111 A.3d at 351; *Dyer*, 813 A.2d at 76; *Contreras-Cruz*, 765 A.2d at 853. A specific-intent instruction for robbery has no bearing on that analysis *not* because the actual taking of Jeffrey's property never occurred—although it did not—but because that instruction captures the wrong moment in time given the crime charged.

Therefore, "we perceive neither error nor prejudice to defendant in the trial justice's decision to decline defendant's request that the specific language that he preferred be included in the jury instructions" for count one. *Lopez*, 45 A.3d at 23 (brackets omitted) (quoting *State v. Adefusika*, 989 A.2d 467, 477 (R.I. 2010)).

### Assault with Intent to Commit Robbery

On count three, assault with a dangerous weapon in a dwelling house with the intent to commit a robbery, defendant concedes that the trial justice instructed the jury that "[t]he defendant's intention to rob [Jeffrey] is an integral element of this charge[,]" but maintains that her omission of the specific-intent instruction was in error. We disagree.

As discussed above, the only burden on the state is to prove every element of the crimes charged against defendant beyond a reasonable doubt. It is well settled in Rhode Island that assault with a dangerous weapon with the intent to rob is a lesser-included offense within the common-law crime of robbery. *See State v. Holley*, 604 A.2d 772, 776 (R.I. 1992); *Brown*, 549 A.2d at 1376-77. This Court has said, in particular, that "[t]his element of taking," or rather, "[t]he specific intent to deprive another permanently of his or her property," "distinguishes robbery from assault with intent to rob." *Brown*, 549 A.2d at 1377. As such, our caselaw deliberately excludes the specific-intent element of robbery from the separate, lesser crime of assault with a dangerous weapon with the intent to rob. *See id.* The defendant incorrectly assigns reversible error to the trial justice for failing to instruct the jury on an element extraneous to the crime charged against him.

We perceive "neither error nor prejudice to defendant" in the jury instructions as provided for count three. *Lopez*, 45 A.3d at 23 (quoting *Adefusika*, 989 A.2d at 477).

### Felony Murder

The defendant's objection is most appropriately raised on count four, where he asserts correctly that a felony murder conviction requires all elements of the predicate felony to be proven beyond a reasonable doubt. *See Oliveira*, 882 A.2d at 1109. It is likewise true that the specific intent required for robbery, to wholly and

permanently deprive, is an essential element of the crime and one that requires instruction because, as this Court has stated, the specific-intent element is not intuitive to a jury. *Robalewski*, 418 A.2d at 821. Even still, defendant misses the mark.

"To obtain a conviction under a felony murder theory, the state must prove all the elements of the underlying felony, or an attempt to commit the underlying felony, and that the death occurred during the perpetration of the felony, beyond a reasonable doubt." *Oliveira*, 882 A.2d at 1111; *see State v. Villani*, 491 A.2d 976, 980 (R.I. 1985); *State v. Innis*, 120 R.I. 641, 656, 391 A.2d 1158, 1166 (1978), *rev'd on other grounds*, 446 U.S. 291 (1980). The felony murder theory illuminates a critical distinction between the principal charge and the predicate felony raised in a criminal case. *See, e.g.*, *Villani*, 491 A.2d at 980 (holding that the trial justice erred by requiring the state to prove beyond a reasonable doubt every element of first-degree murder and, separately, every element of robbery on a felony murder charge); *Jefferson v. State*, 472 A.2d 1200, 1203 (R.I. 1984) (dismissing a claim of double jeopardy where the petitioner was punished for felony murder only and not held additionally culpable for attempted robbery—the predicate felony).

The defendant's argument on count four hinges on this Court's ruling in *State v. Robalewski*, wherein we perceived reversible error on a jury instruction that did not include the specific-intent element of robbery. *Robalewski*, 418 A.2d at 821.

However, *Robalewski* is distinguishable from the case at bar because there, the principal charge levied against the defendant was robbery. *Id.* By contrast, here, the state charged defendant with felony murder during the course, not of a robbery, but of an *attempted* robbery. Attempted robbery is a felony in its own right and does not call for the same specific intent as a regular robbery. *See Jefferson*, 472 A.2d at 1203 (noting the legal distinction between robbery and the lesser, separate offense of attempted robbery).

This Court and federal caselaw draw a clear distinction between the requisite intent for an attempted robbery versus robbery. In *State v. Latraverse*, 443 A.2d 890 (R.I. 1982), Rhode Island adopted the Model Penal Code definition of criminal attempt, which requires that the perpetrator "purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." *Latraverse*, 443 A.2d at 894 (deletion omitted) (quoting § 5.01(1)(c) of the American Law Institute's Model Penal Code (Proposed Official Draft 1962)). As applied to robbery, a defendant may be convicted of *attempted* robbery "so long as his intention and some other substantial step are present," even "before he has actually engaged in threatening conduct * * *." *United States v. Taylor*, 142 S. Ct. 2015, 2021 (2022) (discussing common law principles of attempted robbery) (quoting the American Law Institute's Model Penal Code § 222.1 at 114 (1980)); *see United States v. LiCausi*, 167 F.3d

36, 48 (1st Cir. 1999) (determining that defendants who stole a car and surveilled a grocery store in preparation to rob it, without ever setting foot on the store's property, constituted attempted robbery).

The trial justice furnished the following jury instruction for attempted robbery: "To attempt an offense means to willfully act with the specific intention of accomplishing something that the law forbids. In other words, an attempt is a substantial step towards the completion of the offense with the intent to commit that offense." The trial justice further clarified that, "if you find that the [s]tate has proven beyond a reasonable doubt that the defendant * * * did unlawfully kill Jeffrey * * * while * * * attempting to rob Jeffrey * * *, then you must return a guilty verdict on [c]ount 4."

In light of our caselaw and general common law principles, we hold that these instructions were more than adequate to cover the law on felony murder during the course of an attempted robbery. There was no need for the trial justice to instruct on the specific-intent element of robbery because robbery was not the predicate felony to the felony murder charge. Here again, we perceive "neither error nor prejudice to defendant" in the jury instructions as provided for count four. *Lopez*, 45 A.3d at 23 (quoting *Adefusika*, 989 A.2d at 477).

**Conspiracy**

In Rhode Island, conspiracy "remains a common law crime." *State v. Jilling*, 275 A.3d 1160, 1170-71 (R.I. 2022). "The crime of conspiracy is an agreement between 'two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose.'" *Ros*, 973 A.2d at 1163 (quoting *State v. Graham*, 941 A.2d 848, 863 (R.I. 2008)). "Once an agreement has been made, no further action in furtherance of the conspiracy is necessary to find a defendant guilty of the crime of conspiracy." *State v. Tully*, 110 A.3d 1181, 1194 (R.I. 2015) (quoting *State v. Disla*, 874 A.2d 190, 197 (R.I. 2005)).

In *State v. LaPlume*, 118 R.I. 670, 375 A.2d 938 (1977), this Court recognized that "the crime of conspiracy is separate and distinct from the substantive offense * * *." *LaPlume*, 118 R.I. at 677, 375 A.2d at 941. Following this maxim, the conspiracies implicated under counts two and five must be considered separately and distinctly from the alleged object of those conspiracies—the robbery of Jeffrey.

The trial justice instructed the jury as follows: "[T]he law provides that if two or more persons conspire to commit a substantive criminal act, such as robbery, each person is also guilty of the separate offense of conspiracy. * * * Once the unlawful agreement has been made, the crime of the conspiracy is complete."

Relying on this Court's opinion in *State v. Huntley*, 171 A.3d 1003 (R.I. 2017), defendant argues that the jury had no way of knowing whether the state had

proved the "existence and scope of the unlawful agreement beyond a reasonable doubt" without an instruction on the specific-intent element of robbery—the crime undergirding the alleged conspiracy. *Huntley*, 171 A.3d at 1006 (quoting *State v. Abdullah*, 967 A.2d 469, 475 (R.I. 2009)). This argument fails to convince. Although we opined in *Huntley* that the state must prove the existence and scope of an unlawful agreement, we further expounded that the scope "may be 'inferentially established'" and that "[t]he essence of a criminal conspiracy is the *agreement* to commit an unlawful act." *Id.* (emphasis added) (quoting *Disla*, 874 A.2d at 197). This clarification belies defendant's claim that *Huntley* supports his argument.

So long as the state anchors the conspiracy charge with an underlying crime punishable by Rhode Island law, the state need not prove every element of the underlying offense or even that the underlying offense occurred. *See Jilling*, 275 A.3d at 1170 ("[A]lthough the crime of conspiracy is itself a separate offense, conspiracy counts should also be dismissed when there is no underlying crime on which to base the conspiracy charge." (brackets and deletion omitted) (quoting *State v. Maxie*, 187 A.3d 330, 341-42 n.13 (R.I. 2018))). This Court articulated succinctly in *LaPlume* that "[t]he gravamen of [conspiracy] is entry into an unlawful agreement and once that occurs the offense is complete." *LaPlume*, 118 R.I. at 677, 375 A.2d at 941. Therefore, defendant's contention that the jury required exhaustive instruction on the underlying substantive offense—robbery—to decide the

- 26 -

overarching principal charge—conspiracy—appears unmoored from our caselaw and the common law.

Again, we perceive "neither error nor prejudice to defendant" in the jury instructions as provided for counts two and five. *Lopez*, 45 A.3d at 23 (quoting *Adefusika*, 989 A.2d at 477).

After reviewing the jury instructions *de novo*, we conclude that the trial justice's instructions adequately covered the law on all the crimes charged and, specifically, that her omission of the specific-intent instruction for robbery was not in error. The jury instructions did not reduce the state's burden of proof on any of the crimes charged against defendant. Consequently, we affirm the trial justice's decision to decline defendant's requested changes to the jury instructions on all counts.[8]

**B**

**Motion for Judgment of Acquittal**

The defendant contends that the trial justice erred in denying his motion for judgment of acquittal with respect to the felony murder charge (count four) and the

---

[8] Because we perceive no error with the jury instructions, we need not address the parties' arguments as to harmless error. Similarly, we reject defendant's argument that the purportedly erroneous jury instruction justifies the grant of a new trial on all counts.

charge of conspiracy to commit robbery (count five).[9]  The defendant argues that the state offered insufficient evidence to prove that the intruders on the night of July 28, 2013, either intended or conspired to rob Jeffrey.  The state maintains on appeal that it submitted ample evidence to prove all elements of counts four and five and that the trial justice's ruling on the motion was not in error.

**Standard of Review**

"Rule 29(a)(1) of the Superior Court Rules of Criminal Procedure provides that the trial justice shall order the entry of judgment of acquittal when the evidence is insufficient to sustain a conviction of one or more of the offenses charged." *State v. Maria*, 132 A.3d 694, 698 (R.I. 2016) (internal quotation marks omitted).  "In reviewing the denial of a motion for a judgment of acquittal, we apply the same standard as that applied by the trial justice; namely, we must view the evidence in the light most favorable to the state, give full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt." *State v. Thibedau*, 157 A.3d 1063, 1077 (R.I. 2017) (brackets and deletion omitted) (quoting *Maria*, 132 A.3d at 698).  "If the totality of the evidence so viewed and the inferences so drawn would justify a reasonable juror in finding a defendant guilty beyond a

---

[9] "We have oft stated that, when faced, as here, with both Rule 29 and [Rule] 33 motions, this Court first conducts a review of the new-trial motion." *State v. Gomez*, 116 A.3d 216, 222 (R.I. 2015) (quoting *State v. Storey*, 102 A.3d 641, 646 (R.I. 2014)).  In his brief to this Court, defendant deliberately argued his Rule 29 motion first.  We address the motions in the order presented by defendant.

reasonable doubt, the motion for judgment of acquittal must be denied." *State v. Gomez*, 116 A.3d 216, 225 (R.I. 2015) (quoting *State v. Snow*, 670 A.2d 239, 243 (R.I. 1996)).

**Analysis**

On appeal, defendant argues that the state submitted insufficient evidence to show that the intruders attempted or conspired to rob Jeffrey on July 28, 2013. The defendant avers that the state offered sheer "speculation" as to the intentions of the men who broke into the Lebruns' home. Unless the state can prove that the intruders specifically intended to rob Jeffrey, defendant argues, the felony murder charge must be dismissed because, in that case, the state will have failed to prove beyond a reasonable doubt that Jeffrey was killed during an attempted robbery. Similarly, defendant presses, if the state did not adequately prove that defendant specifically conspired to rob Jeffrey, the conspiracy charge must also be dismissed.

We review the evidence in the light most favorable to the state to determine whether the evidence supports a reasonable inference by the jury that defendant conspired to rob Jeffrey and murdered Jeffrey during the course of an attempted robbery. *See Thibedau*, 157 A.3d at 1077. The defendant asserts that the state submitted insufficient evidence to prove defendant's intention to commit a robbery. We establish at the outset of our review that "circumstantial evidence has the same

probative value as direct evidence, and that the state can rest its entire case upon circumstantial evidence alone." *State v. Brown*, 9 A.3d 1232, 1238 (R.I. 2010).

As to count four, the state offered testimonial evidence from Alexis and Sheri that defendant knew Jeffrey kept marijuana in the house. Sheri also confirmed that "it wasn't a secret" where Jeffrey stored the cash from the business. Additionally, through Alexis's testimony and Sheri's testimony, the state demonstrated that defendant was "in and out" of the room when Sheri vented to Silva about Jeffrey's stinginess and when Sheri expressed her eagerness that someone would teach Jeffrey a lesson.

The state additionally submitted evidence that defendant had unsuccessfully attempted to rob Jeffrey in May 2013. This evidence included (1) the police officers' encounter with defendant blocks away from the Lebruns' home shortly after the break-in; (2) Wong's testimony that traces of defendant's DNA were found on the black sweatshirt abandoned near the Lebruns' property; and (3) Wong's testimony that defendant's DNA was linked to some of the "tools of the trade" found in the backpack left at the Lebruns' house.

Before this Court, the state reiterates that defendant's involvement in the May break-in supports a reasonable inference that, in July, he intended to finish what he started. The defendant impugns the state's attempt to connect the May and July occurrences. If anything, defendant argues, the fact that the May intruders came

armed with "tools of the trade" and the July intruders carried none of these items indicates that, in July, there was no intention to rob Jeffrey but only to attack him.

Even assuming *arguendo* that the home invasions in May and July were unrelated, the evidence presented at trial was still sufficient to support a reasonable inference that the July intruders intended to rob Jeffrey and murdered him during the course of that attempted robbery. *See Ros*, 973 A.2d at 1161 ("We reiterate that, in the context of this issue on appeal, we are required to evaluate the evidence in the light most favorable to the state."). On a motion for judgment of acquittal, this Court must assess "whether a reasonable inference consistent with guilt can be drawn, not whether reasonable inferences consistent with innocence are also possible." *Brown*, 9 A.3d at 1238. Viewing the same evidence in the light most favorable to the state, we concur with the trial justice's determination to deny the motion for judgment of acquittal on count four.

Appealing the trial justice's denial of the motion as to count five, defendant asserts that the state failed to prove the object and scope of the alleged conspiracy. *See Huntley*, 171 A.3d at 1006 ("To convict the accused of the crime of conspiracy, 'the prosecution must prove the existence and scope of the unlawful agreement beyond a reasonable doubt.'" (quoting *Abdullah*, 967 A.2d at 475)). The defendant disputes the trial justice's conclusion that "two individuals in black with masks, armed with a gun, at night, demonstrate a common purpose." Further, defendant

challenges the trial justice's deduction that the object of the conspiracy must have been robbery, as opposed to "any other number of crimes."  This determination by the trial justice, defendant argues, defied the standard this Court established in *Huntley*.

"Although a common agreement is the keystone of the crime of conspiracy, this Court 'has recognized that it is usually very difficult to prove in complete detail the explicit terms of an agreement.'" *Ros*, 973 A.2d at 1163 (quoting *State v. Oliveira*, 774 A.2d 893, 919 (R.I. 2001)).  "Consequently, the conspirators' goals may be inferentially established by proof of the relations, conduct, circumstances, and actions of the parties." *Tully*, 110 A.3d at 1194 (quoting *Ros*, 973 A.2d at 1163). The state may also prove the existence of a conspiracy "based on a tacit agreement shown from an implicit working relationship" between coconspirators and need not produce evidence of "an express agreement." *United States v. Mubayyid*, 658 F.3d 35, 57 (1st Cir. 2011) (quoting *United States v. Patrick*, 248 F.3d 11, 20 (1st Cir. 2001)).

To support a conviction on the conspiracy charge, the state presented evidence at trial that (1) DNA evidence found underneath Jeffrey's fingernails more likely than not included defendant's DNA; (2) Sedina heard two people moving around inside the house after she heard the gunshots; and (3) Parker saw two men, dressed

in black, run out of the Lebruns' house in quick succession and head in the same direction towards Newport Avenue.

The defendant may be correct that, theoretically, the intruders could have intended to commit an offense other than robbery, based on the evidence presented; however, that logic is irrelevant for our inquiry upon reviewing this motion. *See State v. Valdez*, 267 A.3d 638, 643 (R.I. 2022) ("If the totality of the evidence so viewed and the inferences so drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt, the motion for judgment of acquittal must be denied." (quoting *Snow*, 670 A.2d at 243)).

Additionally, we are unmoved by defendant's hypothesis that "empty-handed individuals" could not have intended or conspired to attempt robbery. *See Latraverse*, 443 A.2d at 895 (embracing the rejection by the United States Court of Appeals for the Second Circuit of an argument that the defendants "could not be convicted of an attempted bank robbery because they neither entered the bank nor brandished weapons" (quoting *United States v. Stallworth*, 543 F.2d 1038, 1040 (2d Cir. 1976))); *see also Stallworth*, 543 F.2d at 1040 ("We reject this wooden logic. Attempt is a subtle concept that * * * enables society to punish malefactors who have unequivocally set out upon a criminal course * * *."). We conclude that the testimonial and physical evidence presented support a reasonable inference that defendant conspired to rob Jeffrey on the night of July 28, 2013.

Upon our thorough review of the record in the light most favorable to the state, drawing all reasonable inferences consistent with guilt, we affirm the trial justice's denial of the motion for judgment of acquittal on counts four and five.

## C

### Motion for a New Trial

The defendant additionally argues that the trial justice erred in denying his motion for a new trial on counts four, five, and six—the charges stemming from the July incident. On these counts, defendant claims that the trial justice relied on "meager evidence" insufficient to support any inference beyond "a desire to engage in generic criminal activity."

### Standard of Review

"When passing on a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Maxie*, 241 A.3d 124, 126 (R.I. 2020) (brackets omitted) (quoting *State v. Cerda*, 957 A.2d 382, 385 (R.I. 2008)). "The trial justice must consider the evidence in light of the jury charge, then independently assess the credibility of the witnesses and the weight of the evidence, and also ultimately determine whether he or she would have reached a result different from that reached by the jury." *State v. Gumkowski*, 223 A.3d 321, 328 (R.I. 2020) (quoting *State v. Johnson*, 199 A.3d 1046, 1051 (R.I. 2019)). "If, after conducting this independent

review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Tully*, 110 A.3d at 1192 (quoting *State v. Watkins*, 92 A.3d 172, 191 (R.I. 2014)).

Accordingly, "[i]f the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." *State v. Alexis*, 185 A.3d 526, 537 (R.I. 2018) (quoting *State v. Adams*, 161 A.3d 1182, 1200-01 (R.I. 2017)).

**Analysis**

Similar to the arguments advanced on the motion for judgment of acquittal, defendant contends that the trial justice erred in denying the motion for a new trial because "the weight of the evidence failed to establish that [Jeffrey] was killed during an attempted robbery or that [defendant] had conspired to commit [a] robbery * * *." Specifically on count four, defendant disputes the trial justice's conclusion that the July incident demonstrated "the same MO as the incident on May 19th." The defendant avers that the evidence showing that both events occurred during "the same time in the evening" with "the same number of intruders" in "the same type and manner of dress," does not sufficiently support a connection between the events of May and July such that the May evidence can be imputed onto the July murder.

- 35 -

On count five, defendant argues that the trial justice cited insufficient evidence to support her finding that "there was a conspiracy where [the intruders] would be taking off thereafter, after the robbery that was the subject of the conspiracy." Moreover, defendant argues, the fact that the third-party witness—Parker—did not witness the intruders "carrying any bags or backpacks" shows there was no intent or conspiracy to commit a robbery.

At the outset, we acknowledge that the trial justice opened her discussion on the motion for a new trial by stating the correct standard and that she then articulated specific grounds for denying the motion. This entitles her decision to great deference by this Court. *See State v. Vidot*, 253 A.3d 401, 410 (R.I. 2021).

As required in ruling on a motion for a new trial, the trial justice began her review by analyzing the evidence in light of the jury charge. *See State v. Virola*, 115 A.3d 980, 991 (R.I. 2015). She observed that "[t]here is ample evidence * * * that this defendant had knowledge of the cash and the drugs that were maintained at [Jeffrey's] residence, providing both the motive and opportunity * * * to target this complaining witness for both the May 19th incident as well as the July 28th incident." The trial justice also noted the other "substantial evidence of record," including the "uncontradicted testimony * * * of Tamara Wong" showing that defendant's DNA was found under Jeffrey's fingernail after the July attack. And

moreover, she stated, there was "uncontradicted testimony * * * that the decedent * * * died as a result of a gunshot wound."

Next, the trial justice assessed the credibility of the witness testimony and the weight of the evidence. *See Virola*, 115 A.3d at 992. At this stage, the trial justice determined that the testimony "from each of the Lebrun women" constituted "credible evidence[.]" She also emphasized the reliability of Parker's testimony, which applied solely to the convictions on counts four, five, and six. The trial justice recounted that, according to "the most independent individual in this case," the two intruders absconded separately, yet in sync, from the Lebruns' home on the July night in question. The trial justice reviewed the similarities connecting the May invasion to the July incident, listing "the same type and manner of dress, * * * the same time in the evening, [and] two people." She then noted that immediately after gunshots were heard, "one person [ran] out of the house * * * and then a minute later, another individual, again, dressed all in black" ran in the same direction.

Finally, the trial justice summarized her independent assessment of the evidence with the conclusion that she would not have reached a different result from the jury. *See Virola*, 115 A.3d at 992. It is clear that the trial justice assiduously followed the proper steps to decide on the motion for a new trial. *See State v. Franco*, 225 A.3d 623, 631 (R.I. 2020) ("In providing a rationale for a decision, however, the trial justice need not refer to all the evidence supporting the decision but need only

cite evidence sufficient to allow this Court to discern whether the justice has applied the appropriate standards." (quoting *State v. DiCarlo*, 987 A.2d 867, 870 (R.I. 2010))).

Accordingly, we hold that the trial justice did not overlook or misconceive material evidence nor was she otherwise clearly wrong in denying the defendant's motion for a new trial.

## IV

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to that tribunal.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Juan Gibson. |
| **Case Number** | No. 2021-139-C.A. (P1/19-820AG) |
| **Date Opinion Filed** | April 4, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Kristin E. Rodgers |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General |
| | For Defendant:<br><br>Megan F. Jackson<br>Office of the Public Defender |